UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,               No. 2:09-cr-00094 MCE

          Plaintiff,

     v.                            **FINDINGS OF FACT AND
                                   CONCLUSIONS OF LAW**

JOSE SALVADOR SANCHEZ-PALOMINO
and FRANCISCO JAVIER VELASCO,

          Defendants.


                         ----oo0oo----


     Defendants Jose Salvador Sanchez-Palomino and Francisco
Javier Velasco ("Defendants") are charged with (1) conspiracy to
possess with intent to distribute five kilograms or more of
cocaine, and (2) possession with intent to distribute five
kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and
841(a)(1), respectively.  Defendants filed a Motion to Dismiss
the Indictment or Suppress Evidence Based on Equal Protection and
Due Process Violations (ECF Nos. 59 and 60) and requested an
evidentiary hearing on the matters.

                                1

This case arises from an incident on February 12, 2009. Defendants were traveling northbound on Interstate 5 ("I-5") when Shasta County Sheriff Deputies John Kropholler and Christopher McQuillan stopped their vehicle for allegedly speeding in violation of California Vehicle Code § 22349(a).  The officers subsequently searched portions of the vehicle and found thirteen kilograms of cocaine hidden in the rear bumper.

Defendants argue that Officers Kropholler and McQuillan "almost exclusively stop Hispanic drivers," and then detain the drivers and passengers while voraciously searching and dismantling parts of the vehicle.  Defendants maintain that this selective enforcement of the vehicle code violates their rights under the Fourth and Fourteenth Amendments to the United States Constitution (hereinafter, the "Fourth Amendment" and the "Fourteenth Amendment," respectively).  In contrast, the United States of America (the "Government") argues that Defendants were pulled over initially for speeding alone, and their race played no part in the officers' decision to stop and search their vehicle.

The matter was called for an evidentiary hearing beginning September 13, 2010.  Evidence was presented on the pleadings and during seven days of testimony from numerous witnesses, and the Court heard final arguments from both sides on day eight.  Based upon the totality of the circumstances and weighing the credibility and veracity of each witness, the Court makes the following Findings of Fact and Conclusions of Law.

///

///

2

**FINDINGS OF FACT**

NSI Cal-MMET DHE

1.   Officers Kropholler and McQuillan are Shasta County Sheriff department officers assigned to the North State Initiative California Multi-Jurisdictional Methamphetamine Team ("NSI Cal-MMET").   NSI Cal-MMET was originally created in 2002 to curb the production and distribution of methamphetamine drugs in several northern California counties.

2.   In 2007, the counties of Shasta, Tehama, Butte, Glenn, and Colusa entered into a memorandum of understanding to collectively fight drug trafficking.   The program has evolved over time, and the task force currently focuses on catching all types of drug traffickers along the I-5 corridor that runs through the above counties.

3.   Officers Kropholler and McQuillan are full-time employees of NSI Cal-MMET's Domestic Highway Enforcement team ("DHE"), who patrol I-5 mostly in the Shasta County region between the Oasis Road and Bridge Bay Road exits.   Currently, each officer is assigned to a heavily-marked police-outfitted Chevrolet Tahoe.   Prior to late 2009, Officers McQuillan and Kropholler generally patrolled the same area in one vehicle.

4.   Other officers from the Shasta County Sheriff's department regularly assist Officers Kropholler and McQuillan, and work overtime as part of NSI Cal-MMET DHE.   An overtime officer is with the officers eight out of every ten stops.

///

///

3

5.   Because Officers Kropholler and McQuillan often patrol the same area along I-5 in Shasta County, they stop to assist each other if they notice a search or stop in progress for "safety reasons."

6.   NSI Cal-MMET DHE conducts a high volume of traffic stops to look for criminal indicators of smuggling.  The task force mostly patrols in this area because the shoulder areas of I-5 are widest there within the county, making traffic stops there safer for the officers.

7.   In addition to standard police vehicle equipment such as the California Law Enforcement Telecommunications System ("CLETS"), Officer McQuillan's police vehicle is equipped with an in-car DVD system to record stops, document them for prosecutions, and assist in officer safety.  The vehicle also has an Automated License Plate Registration System that, in conjunction with CLETS, can cross-check a vehicle's license plate with the California Department of Justice database for stolen license plates or vehicles.  Officer McQuillan has a four-way Doppler radar that can calibrate the speeds of up to four vehicles at once.  Officer McQuillan uses these tools as additional means to initiate traffic stops.

8.   The primary mission of NSI Cal-MMET DHE is not to issue traffic citations.  The officers use the California Vehicle Code "as a tool" to pull a vehicle over and search for drugs.  Traffic citations are issued at times, but usually only when there is a "flagrant violation" of traffic laws, and "the risk to public safety is great."

///

Mexican Drug Cartels

9.   I-5 traverses three states, including numerous California counties, from Mexico to Canada, and a main artery for drugs to flow throughout the west coast and Canada.  In the five-county region the task force mainly supports, the majority of cocaine and heroin comes from Mexico and originates from Mexican drug cartels.

10.   NSI Cal-MMET DHE focuses particularly on mid- to high-level drug smugglers, ninety-nine percent of whom originate from Mexico.  A mid- to high-level drug smuggler is characterized as someone who is attempting to traffic more than five kilograms of drugs.  Though only roughly fifty percent of methamphetamine and marijuana is manufactured in Mexico, much of the mid- to high-level smuggling of all drugs in the United States is managed by Mexican drug cartels.

11.   Mexican drug cartels commonly choose to employ people of Mexican descent, and prefer to work with individuals who have a familial relationship to the leadership of the cartel.

12.   There was conflicting evidence presented, both on the pleadings and during the hearing, as to the proper baseline of the Hispanic population on this particular stretch of I-5. Defendants proffered evidence of the population of Shasta County, as well as California Highway Patrol accident data to attempt to quantify the Hispanic traffic along I-5.[1]

///

[1] This portion of Defendants' argument would not be well taken if, for example, the stops were conducted in San Diego, Sacramento, or San Joaquin counties where the racial demographics are vastly diverse compared to Shasta County.

The Government's expert, Mark Carretia, testified at the hearing that neither statistical baseline properly reflects the racial composition of the traffic flowing along the northern portion of I-5.   The Court finds that the statistical data proffered by Defendants is not a sufficient baseline or indicator of the population of Hispanic traffic along this stretch of I-5.

13.   Mexican drug cartel operations along I-5 appear to favor using import sedans such as Nissans, Toyotas, and Hondas. Cars of this nature have many sidewall compartments that are void, perfect for smuggling contraband.   Passengers and drivers of vehicles smuggling contraband do not usually have access to the hidden compartments containing illegal items, and rely on their contacts at the origin and destination of the vehicle to load and unload the smuggled items.

Officer McQuillan

14.   Officer McQuillan has been employed by the Shasta County Sheriff's Office since 1999.   He has over sixteen years of police experience, and over twelve years of criminal interdiction experience on highways and interstates across California.   He has worked as a narcotics investigator since 2005.   Additionally, Officer McQuillan handles asset forfeiture processing for Cal-MMET and the Shasta County Sheriff's Office.

15.   Before becoming a police officer, Officer McQuillan installed auto alarms on Nissans, Subarus, and Chevrolets for a car dealership in Redding, California.   He testified under oath that he has "worked on literally thousands of vehicles."
///

16.   Officer McQuillan has completed a number of training courses, including a course on racial profiling/diversity training, basic narcotics investigations, and specialized training courses on drug interdiction, vehicle hiding compartments, and the specifics of drug cartels.

17.   In addition to his other duties, Officer McQuillan is also currently assigned as a terrorist liaison officer with the Department of Homeland Security. In this position, he shares anti-terrorism information and daily updates on national terrorist threats and security awareness issues with the Shasta County Sheriff's Office.

18.   Officer McQuillan has participated in at least fifty undercover purchases of controlled substances, and was the undercover agent purchasing controlled substances on three occasions.  While working in highway interdiction, Officer McQuillan has investigated at least two hundred cases where controlled substances were seized from vehicles traveling on I-5.

19.   Officer McQuillan has two sustained findings of misconduct with the Shasta County Sheriff's Office in 2002; one involving a delinquent gas station charge account that went to small claims court, and another for using a county-owned laptop for personal use, and failing to return the laptop in a timely fashion.

///
///
///
///
///

7

Officer Kropholler

20.   Officer Kropholler has been employed by the Shasta County Sheriff's Office since 1994, and has been assigned to NSI Cal-MMET DHE since 2007.  He is also certified as a canine handler and trainer.

21.   Officer Kropholler has completed over one thousand hours of training as part of his law enforcement duties.  He has logged over 150 hours alone in training on counter-smuggling, smuggling, and interdiction.

22.   Officer Kropholler has two disciplinary issues in his police file; in 1997, he was suspended from duties for thirty days for falsifying his employment application (there appeared to be a discrepancy regarding the means by which one of his previous employments was terminated) in violation of Shasta County's policy on dishonesty.  In 2003, Officer Kropholler received a letter of reprimand from the Sheriff's Office for taking an unauthorized break from his duties outside of his patrol area.

Use of Canine

23.   Officer Kropholler has a canine, Maximus, that routinely travels with the DHE and assists in locating drugs and other contraband in stopped vehicles.  NSI Cal-MMET DHE protocol requires that every effort be made to have a canine present during a traffic stop.  Officer Kropholler stated that, to his knowledge, a warrant is not necessary to walk Maximus around a vehicle under suspicion of smuggling.

///

///

24.  Maximus is trained specifically on highway interdiction and alerts to the presence and location of drugs.  The canine has participated in over 780 vehicle searches.  Officer Kropholler is careful not to overuse Maximus, to prevent him from being "tricked" or otherwise decreasing his effectiveness.  When he is used, Maximus almost always searches a car outside first, then proceeds inside the vehicle while he is on a leash six feet in length.  Officer Kropholler operates the dog from the passenger side of a vehicle for safety purposes.

25.  Maximus is specifically trained with Officer Kropholler to alert to the presence of methamphetamine, cocaine, marijuana, and heroin.  Maximus alerts Officer Kropholler to the presence of drugs by pawing the area, and altering his body language in a way that Officer Kropholler is trained to notice and interpret.

26.  Maximus is trained, and Officer Kropholler is trained to identify, various alerts, but there are inherent flaws in canine drug interdiction.  The canine can "miss," which indicates Maximus alerts to an area, but no contraband or drugs are subsequently found in that area.  This is distinct from a "false positive," where Maximus correctly alerts to a smell or presence of odor, but nothing is seized, and likely the odor indicates contraband previously resided in that area.

27.  Although Maximus may have been evaluated and trained appropriately, his evaluator had a fiduciary relationship with the canine, in violation of industry standard protocol.  Canine training expert William Schroeder has personally witnessed over 800 canine searches, and has never seen a canine alert one hundred percent correctly in the field.

Though Officer Kropholler asserted that Maximus alerts one hundred percent correctly in the field, the Court finds that Maximus likely does not alert correctly one hundred percent of the time.

Warning Citations

28.   In October 2009, NSI Cal-MMET DHE officers began using warning citations to record demographic information of the stops they initiated.  The citation is designed to alert the "innocent motoring public" that they have been caught violating the California Vehicle Code, but "in the interest of public education," the officers are only issuing a warning.

29.   In addition to issuing the warning citation, the officers will also explain to the driver, either directly or indirectly through questioning, that the primary mission of the stop is to look for weapons, drugs, or contraband.  This process is designed to place the innocent motoring public at ease in knowing they will not be ticketed.

30.   Officers Kropholler and McQuillan developed and designed the warning citation, including what they felt was pertinent information to collect from a detained driver.  Officer Shawn Pardazi, a trainer for the National Drug Interdiction Assistance Program, assisted the officers with drafting the warning citations.

31.   The officers are not required to issue the warning citations every time they pull a vehicle over, but it is highly encouraged, and they attempt to issue a warning citation on every stop that does not result in a traffic citation.

32.   The warning citation is filled out by one of the officers who collects information from a driver including, but not limited to, name, address, date of birth, driver's license number, and race.   The citation also documents the time, date, and day of the week the stop was performed.

33.   Another section of the warning citation provides boxes for an officer to check based on the type of conduct that proceeds after the initial stop.   For example, there is a box to check if consent is given for a search of the vehicle.   The citation also documents what type of search is conducted, whether a search canine is used, if probable cause is present, whether contraband is found, etc.

34.   There was conflicting testimony regarding the terms under which the canine box of the warning citation is checked. Officer McQuillan testified that if the canine does no alert to the presence of drugs or contraband, then the canine search box is not checked.   Officer Kropholler, on the other hand, stated that if the canine box is checked, that means Maximus was used either as a tool, or as part of a probable cause search, regardless of whether contraband was ultimately discovered.   The Court finds that regardless of whether the box on the warning citation was checked, Maximus was used as both a tool and as part of a probable cause search in the instant case.

35.   The warning citations are signed by both the issuing officer and the driver of the vehicle.   The driver signs to acknowledge that they have received a written warning for committing a California Vehicle Code violation.

///

11

1    36.   The race of the driver is recorded on the warning

2  citation to prevent officers from being accused of racial

3  profiling.  Officer McQuillan either assumes the race of the

4  driver, or "plainly ask[s] them what race they go by."  If

5  Officer McQuillan does not ask the driver their race, he assumes

6  their race "based off of a lot of different factors as to what

7  they're telling" him.  One factor that influences Officer

8  McQuillan's assumption about the race of the driver is whether

9  the driver speaks with an accent.  Since both officers often rely

10  on self-reporting and guesswork, the driver's race as indicated

11  on the warning citation can be inaccurate. For example, some

12  Hispanic drivers were listed as white or Caucasian, and some

13  white drivers were listed as Hispanic.

14    37.   Between October 2009 and May 10, 2010, Officers

15  Kropholler and McQuillan issued 384 warning citations, mostly

16  along the same stretch of I-5 in Shasta County.  Officer

17  McQuillan testified that, to his knowledge, approximately forty-

18  four percent of these warning citations were issued to drivers

19  where Hispanic was indicated as the driver's race on the warning

20  citation.[2]  Some warning citations may be missing or not counted

21  in the final tally, as the Shasta County Sheriff's Office

22  recently located additional citations not originally turned over

23  as part of this investigation.  Sporadically, the warning

24  citations are issued as part of the driver's arrest for smuggling

25  contraband.  In that situation, the warning citation is attached

26  to a written police report.

27

28    [2] Approximately 30 of the 384 citations were issued to
women.

12

38.   On at least two occasions, Officer McQuillan conducted
a search of a vehicle and failed to properly acknowledge the
search on the signed warning citation he issued to the driver of
the searched vehicle.  On at least six occasions, a NSI Cal-MMET
DHE officer failed to record the race of the driver on warning
citations issued between October 2009 and May 10, 2010.

39.   The Court finds that since Officers McQuillan and
Kropholler do not consistently issue warning citations, their
statistics are inaccurate and they have under-reported the actual
number of stops conducted.  Further, the officers' procedure
issuing warning citations to arrested smugglers is not
consistent, and therefore there is an inaccurate count as to how
many of the warning citations correspond to the officers locating
and seizing contraband from a vehicle.

Criminal Indicators

40.   The primary way NSI Cal-MMET DHE determines which
vehicles to investigate is by relying on their extensive police
training and field work to actively look for indicators of
criminal behavior.  There are at least thirty items or
observations that, when taken in the totality of the situation,
suggest that a driver or vehicle passenger is engaged in criminal
behavior.

41.   Once Officer McQuillan observes several indicators
exhibited by the driver and/or passengers in a vehicle, he gauges
them "against the innocent motoring public to know what the
common baseline is for the traffic pattern of that area."
///

42.   Indicators of criminal smuggling can include the following: (1) only one vehicle key, or few keys, on a key ring; (2) the strong odor of a "masking agent" or air freshener emanating from a vehicle; (3) extreme nervousness; (4) presence of "narco saints" or other display of Catholic artifacts tied to Mexican drug cartels; (5) discrepancies between traveling partners as to the origin or destination of the vehicle; (6) no one in the vehicle owns the car or has the car registered in their name; and (7) a newly purchased or rental car.

43.   Officer McQuillan testified that he cannot tell whether a car is owned by a third party before he stops the vehicle. Seven out of ten times he can tell whether a car is rented from his vantage point either stopped or traveling along I-5.   The Court finds that few, if any, of these criminal indicators can be spotted by the officers before a vehicle is pulled over.

44.   While looking for criminal indicators, Officer McQuillan does not stop cars on the highway without some kind of probable cause that a law has been violated, or a "reasonable suspicion" that a law has been violated.

Traffic Stops

45.   Officer McQuillan and Officer Kropholler usually sit in the police vehicle(s) parked perpendicular to I-5 and facing northbound traffic.   The vehicles are marked and placed in such a way as to elicit "an adrenaline dump" from a smuggler.   An adrenaline dump, as testified to by Officer McQuillan, is an immediate, noticeable, and abrupt change in behavior by the driver that indicates the driver has observed a police vehicle

and is exhibiting outward signs of nervousness or fear.
The driver immediately attempts to conform his or her behavior
with the law.  Examples of a noticeable adrenaline dump are a
marked change in vehicle speed, changes in the driver's demeanor,
car occupants failing to make eye contact with the police
vehicle, and other factors.  The officers also scan traffic for
behaviors inconsistent with the "innocent motoring public."

46.  More than the reaction of the passengers, when Officer
McQuillan is observing, he is looking for a vehicle's reaction to
his presence near the car.  He specifically evaluates "what the
vehicle is doing in relationship to the innocent motoring public
that surrounds it."  Examples of suspicious vehicle behavior
include sudden slowing, changing lanes, and closely following a
truck for no apparent reason.

47.  If Officer McQuillan observes a vehicle violating the
California Vehicle Code, or has other reasonable suspicion that
the vehicle's occupants are engaging in criminal behavior, then
he makes an initial decision to stop that particular vehicle.  At
that point, he will run an inquiry on the license plate.

48.  On at least one occasion, Officer McQuillan was in his
vehicle perpendicular to I-5, and noticed that a driver was
wearing a white shirt and was not wearing his seatbelt.  In that
situation, he stopped the driver at approximately 1:15 a.m., in
the dark.  Officer McQuillan also testified that he can observe
from his vantage point drivers holding cell phones up to their
ears.

///

///

Though both officers testified that they cannot determine a driver's race or ethnicity while observing moving vehicles, based on the above examples, the Court finds that it is possible the officers can make a conjecture or assumption about a driver's race before a vehicle is pulled over.

49.   As Officer McQuillan moves from his perpendicular location and into merging traffic, he pulls up near the vehicle he has decided to stop, and looks for other indicators of criminal behavior and/or violations of the vehicle code. Examples of what Officer McQuillan looks for include the number of occupants in the vehicle, any occupants not wearing seatbelts, a driver talking on a cell phone, or some object or mechanism obstructing the driver's view; any activity that purportedly violates the California Vehicle Code.

50.   Generally, when an officer is positioned along this corridor of I-5, most of the traffic flows at a speed of around 65-70 miles per hour.  In addition to speeding vehicles, if a car is traveling significantly below the speed limit, Officer McQuillan may stop those drivers.  Often, there are many cars at any given time disobeying the posted speed limit.

51.   Once he has ascertained enough information to obtain probable cause, Officer McQuillan will pull his police vehicle behind the vehicle in question and "conduct a stop," or pull the vehicle over.  If he is alone, Officer McQuillan will approach the vehicle from the passenger side, indicate to the driver the reason for the stop, and continue to watch for indicators of criminal behavior.  If both officers are present during the stop, they will both approach the vehicle for "safety reasons."

16

52.  Officer McQuillan will often engage in conversation with the occupants of the vehicle and ask for identification.  He uses CLETS or other means of police communication, to run an individual's name for warrants, criminal background information, and/or information about the vehicle.  Officer Kropholler, when he first approaches a stopped vehicle, identifies himself, explains the reason for the stop, and attempts to engage in some casual conversation by asking an "icebreaker" or some innocuous question.

53.  During the stop, both officers are continually scanning and analyzing the situation for evidence of criminal behavior. If indicators of criminal behavior are prevalent, or other reasonable suspicions are present, then Officer McQuillan will ask the driver for consent to search the vehicle.  If the occupants exit the vehicle at Officer McQuillan's request, he often will do a "Terry pat-down," or ask the occupants if they have any weapons and if he may search the occupants' person.

54.  If a driver refuses consent to search the vehicle, then it is possible that Officer Kropholler would walk the canine around the vehicle's perimeter to search for contraband and drugs anyway.  If the driver of a vehicle does not speak English well, or if language is a barrier to communicate, then consent is not an option.  Instead, Officers McQuillan or Kropholler will walk a canine dog around the perimeter of a vehicle to obtain probable cause to search the vehicle.

55.  If consent is given, or if the canine alerts to the presence of contraband, Officer McQuillan and/or his team will conduct a thorough, systematic search of the vehicle from front to back, bottom to top.

17

These searches often take place on the shoulder of I-5.  In some circumstances, Officer McQuillan will move the search to another location for the safety of himself and the parties involved.

56.  When Officer McQuillan requests consent to search a driver's vehicle, there is no requirement that he advise the driver of any details or the potential extent of the search. While he does not "arbitrarily tear people's cars apart," if Officer McQuillan notices a part of the car that has been "tooled," or appears to be handled inconsistent with vehicle factory standards, that is an indicator there may be contraband in or near that area, and the team will search that portion of the vehicle.

57.  These searches can include the dismantling of vehicle bumpers, doors, roof, airbag compartments, and any other place where the canine alerts or where the officers suspect contraband may be hidden.  At least one witness testified that he saw something that resembled a camera inserted into the muffler of a vehicle as part of a search conduct by Officers McQuillan and Kropholler.  Though the officers deny using any such tool, the Court finds that it is possible the officers use various tools and other resources to conduct a vigorous search of a vehicle, including a comprehensive inspection of a vehicle's muffler.

58.  Searches of this kind have lasted up to, and in excess of, two hours.  During that period, the occupants of the vehicle being searched are not free to leave.  Instead, the occupants must wait either in the back of a police vehicle, or near the side of I-5 if the vehicle has not been moved to another location.

18

1    59.  Officer McQuillan does not use race as a factor in
2 conducting any portion of these traffic stops.  Specifically,
3 Officer McQuillan stated it would be "counterproductive" for him
4 to target Hispanic drivers, as the drug trafficking trade is
5 "evolving," and cartels are constantly altering their tactics and
6 strategies to evade police.

7    60.  Officers McQuillan and Kropholler have repeatedly
8 detained, searched, disrespected, and ill-advised Hispanic males
9 of their rights during traffic stops along I-5.

10

11 <u>The Stop in Question</u>

12    61.  Officers Kropholler and McQuillan were patrolling I-5
13 in Shasta County in the afternoon of February 12, 2009.  There is
14 conflicting testimony as to the weather conditions that
15 afternoon.  Defendants contend the weather was not rainy, but
16 clear.  The officers recalled the driving conditions to be rainy,
17 wet, and slick.  The Court finds that based upon the officers'
18 experience, and the totality of all the evidence presented during
19 the hearing, that there was evidence of moisture on the road and
20 the vehicle which indicates that there had been rain on the
21 particular portion of I-5 where the Defendants' vehicle was
22 stopped.

23    62.  As the officers were traveling northbound on I-5, they
24 both testified that they noticed a gold Nissan Maxima that
25 appeared to be speeding.  There is conflicting evidence regarding
26 the Maxima's speed at approximately 1:30 p.m.

27 ///

28 ///

1   Officers McQuillan and Kropholler testified that they paced the

2   vehicle as traveling approximately 82 miles per hour in 65 miles

3   per hour zone.  Defendant Velasco testified he was driving the

4   Maxima, that it was on cruise control, and that the cruise

5   control was set at 65 miles per hour.  Both officers have

6   extensive experience in highway interdiction, and Officer

7   McQuillan precisely explained that he was driving northbound on

8   I-5 in his police-issued vehicle when he noticed a gold Nissan

9   Maxima pulling ahead of traffic in front of him.  The Maxima was

10  moving "significantly faster than the other cars in traffic."

11  The officers quickly caught up to the vehicle, and paced it at

12  approximately 82 miles per hour.  The Maxima's speed posed a

13  safety risk to the motoring public.  Therefore, the officers

14  executed a traffic stop.  By contrast, all Defendant Velasco

15  stated was that he knew he was traveling 65 miles per hour

16  because his cruise control was on in the Maxima.  Defendant

17  Velasco failed to lay the foundation for his familiarity with the

18  vehicle's speedometer, the accuracy of the cruise control, or any

19  other specific information that corroborates his testimony.

20  Therefore, the Court finds that at approximately 1:30 p.m. on

21  February 12, 2009, the gold Maxima was traveling at 82 miles per

22  hour.[3]

23  ///

24  ///

25

26      [3] There is conflicting testimony regarding the accuracy of
    the officers' report as to the actual time they first spotted
27  Defendants' vehicle, versus when they placed the sirens on and
    pursued Defendants' vehicle.  The Court makes no finding of fact
28  on this issue.

20

63.   Officer Kropholler could not tell the race of the vehicle's occupants at the time of the stop.   Once the Maxima stopped, Officer McQuillan approached the driver's side of the vehicle, while Officer Kropholler simultaneously approached the passenger side.

64.   Officer Kropholler made verbal contact with Defendant Sanchez-Palomino on the passenger side of the vehicle.   Upon approach, he immediately smelled the "overwhelming odor" of air freshener.   He also saw various food wrappers, energy drinks, and clothing strewn about the vehicle.   The Maxima had a "lived-in" look, indicating that someone had been spending a lot of time in the car.

65.   During the stop, Officer Kropholler believed that Defendant Sanchez-Palomino understood some, and spoke enough English to properly communicate.[4]   Officer McQuillan acknowledged that, in observing the interaction between Officer Kropholler and Defendant Sanchez-Palomino, there was a "language barrier."[5] However, Officer Kropholler was able to question Defendant Sanchez-Palomino about the nature of the trip and other basic information.

///

///

_____

[4] While Defendant Sanchez-Palomino testified at the hearing, his entire testimony was subsequently stricken, and therefore not considered for purposes of issuing the Court's Findings of Fact and Conclusions of Law.   See Transcript of Record at 8-13, United States v. Sanchez-Palomino, 2:09-cr-00094 (ECF No. 115).

[5] Federal investigator Charles Gillespie testified that Defendant Sanchez-Palomino has significant trouble speaking and understanding English, was never formally educated in English, and must use Spanish to communicate.

Defendant Sanchez-Palomino appeared to be extremely nervous but provided Officer Kropholler with identification.  During the stop, Officer Kropholler asked Defendant Sanchez-Palomino if he spoke English, and he replied "a little," and consistently answered "appropriately" the questions Officer Kropholler asked. Defendant Sanchez-Palomino was also able to explain that he was traveling from San Diego, California to Yakima, Washington to visit family.  When Officer Kropholler asked Defendant Sanchez-Palomino to step out of the Maxima, he stepped out of the vehicle "without any hesitation," and responded "sure" when Officer Kropholler asked him if he was willing to consent to a search of his person. Defendant Sanchez-Palomino placed his arms out as if to consent to a search.  During this search, Officer Kropholler located a bolt and socket in Defendant Sanchez-Palomino's pants pocket.

66.  At some point during the stop, but before Maximus searched the vehicle, the officers conferred and determined that the driver and passenger had given conflicting information regarding the nature of their trip, the trip's origin and destination, and that Defendant Velasco appeared confused as to Defendant Sanchez-Palomino's name.  Officer McQuillan requested identification from Defendant Velasco, and returned to his police vehicle to run his name through the police database.[6]

///

///

_____

[6] There was conflicting evidence presented as to whether Defendant Velasco's name was ever run through CLETS, or otherwise investigated by Officer McQuillan.  The Court makes no finding of fact on this issue.

67.   Officer Kropholler felt Maximus would be useful to aid in the officers' investigation because (1) he smelled the strong odor of air freshener; (2) the vehicle appeared to be "lived-in;" (3) Defendant Sanchez-Palomino was extremely nervous; (4) Defendants gave the officers conflicting statements as to their origin and destination and purpose of the trip; and (5) upon searching Defendant Sanchez-Palomino, Officer Kropholler located a bolt and socket upon his person.   The bolt and socket are common tools used to manipulate car parts.

68.   Even without the bolt and socket, Officer Kropholler's suspicions were raised about the vehicle and its occupants, and he probably would have brought Maximus out to search the vehicle anyway.

69.   Officer Kropholler brought Maximus out of his holding pen in the police vehicle and led him towards Defendants' vehicle.   Maximus alerted to the rear middle bumper outside the vehicle, and the rear seat area inside.   In addition to Maximus' alert, Officer Kropholler testified that he could tell the factory-installed materials in the Maxima had been either removed or tampered with.

70.   Officer McQuillan removed the carpet from the trunk area near the rear bumper and noticed a missing bolt from the plastic bumper cover.   The search revealed a hidden compartment built behind the bumper.   The officers removed the door to the hidden compartment and immediately identified what appeared to be kilo-sized bricks of white powder.

///

///

71.   Using a Narc II field screening test, Officer McQuillan identified the substance in the bricks as cocaine.

72.   Officer Kropholler estimated that the Maxima was stopped approximately five and a half minutes from the beginning of the stop to the time the officers located the approximately thirteen kilograms of cocaine hidden in the Maxima.

73.   Officers Kropholler and McQuillan later matched the bolt in Defendant Sanchez-Palomino's pants to the missing bolt from the plastic bumper cover.

## CONCLUSIONS OF LAW

Given the foregoing Findings of Fact, and for the reasons stated below, the Court concludes that there is insufficient evidence of a constitutional violation to merit suppression or dismissal of the charges against Defendants.

### A.   Fourth Amendment

Defendants posit that their Fourth Amendment rights were violated when Officers Kropholler and McQuillan searched their vehicle without a warrant and without consent.   Defendant Sanchez-Palomino specifically argues that since he lacks the ability to communicate and understand English, the search of his person was illegal.   Defendants contend that even if the search was valid, the stop was impermissibly prolonged in violation of their Fourth Amendment rights.

///

The Government instead argues that (1) Defendant Sanchez-Palomino consented to the search and pat-down; (2) even if he did not consent, the doctrine of inevitable discovery doctrines vitiates suppression; and (3) the traffic stop was not unduly prolonged.

### 1.   Probable Cause to Search

A search and seizure conducted without a warrant is "per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well delineated exceptions." United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001) (quoting Minnesota v. Dickerson, 508 U.S. 366, 372 (1993)).  The burden is on the government to persuade the court that a search is constitutionally permissible. Hawkins, 249 F.3d at 872.  Police officers may conduct brief investigatory stops of vehicles if their actions are "supported by reasonable suspicion" that criminal activity "may be afoot." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal citations omitted).

Probable cause to search exists when "police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Noster, 590 F.3d 629, 633 (9th Cir. 2009) (internal citations omitted).  The trier of fact must examine the "totality of circumstances" in each case to decide whether "the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273.

25

1   In the instant case, Defendants were traveling at 82 miles

2   per hour in excess of the posted speed limit, which is a

3   violation of the California Vehicle Code.  Officers Kropholler

4   and McQuillan were able to determine Defendants' speed by relying

5   on their vast highway interdiction and police experience, and

6   also by pacing the vehicle in their own police truck to determine

7   the Maxima's speed.  Based upon this information, the officers

8   had reason to believe that Defendant Velasco, the driver, was

9   committing a crime long before they ever actually pulled the

10  vehicle over.  Therefore, as a matter of law, the Court concludes

11  that Officers Kropholler and McQuillan had probable cause to

12  stop, or seize, the vehicle without a warrant.

13

14          **2.   Consent to Search Defendant Sanchez-Palomino's
                   Person**

15

16  When the government asserts that consent was given by a

17  defendant to perform a search, the Fourth Amendment requires it

18  to "demonstrate that the consent was in fact voluntarily given,

19  and not the result of duress or coercion, express or implied."

20  Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).  See also

21  United States v. Drayton, 536 U.S. 194, 201 (2002) ("Even when

22  law enforcement officers have no basis for suspecting a

23  particular individual, they may pose questions, ask for

24  identification, and request consent to search.").

25  ///

26  ///

27  ///

28  ///

26

In considering whether consent was voluntarily given during a stop, a court may consider any, or all, of five factors: (1) whether a defendant is in custody; (2) whether the arresting officers had their guns drawn; (3) whether the defendants were Mirandized; (4) whether defendant was "notified that he had a right not to consent; and (5) whether the defendant had been told that a search warrant could be obtained." United States v. Vongxay, 594 F.3d 1111, 1119-20 (9th Cir. 2010). The government bears the burden of establishing consent was freely and voluntarily given. Id. at 1119. The voluntariness of consent is a "question of fact to be determined from all the surrounding circumstances." Id. When the circumstances specifically involve foreign nationals, a court must determine whether consent was voluntary in light of any language barrier. United States v. Amano, 229 F.3d 801, 805 (9th Cir. 2000).[7] Again, the factors for consideration are permissive, as the court "in all cases must examine the totality of the circumstances." Id.

The Court concludes that it is clear from Defendant Sanchez-Palomino's actions and words that he understood enough English to communicate effectively during the stop, and that his consent was not coerced or misunderstood by Officer Kropholler.

///

---

[7] Specifically, Amano encourages the Court to assess the voluntariness of consent by examining, "among other things, whether the defendant signed a written waiver;" if the defendant's rights were read in their native language; whether the defendant appeared to understand them; whether the defendant "had the assistance of a translator; whether defendant's rights were explained painstakingly; and whether the defendant had experience with the American criminal justice system." See Amano, 229 F.3d at 804-05.

1  Defendant Sanchez-Palomino knew he was being interrogated by an
2  officer of the law, and his knowledge of police procedure
3  indicated that he chose to cooperate with Officer Kropholler.
4  Defendant Sanchez-Palomino was not in custody or restrained.  He
5  had not yet been arrested, and as such, <u>Miranda</u> warnings would
6  have been premature.

7       Even assuming he did not fully understand Officer
8  Kropholler's words, Defendant Sanchez-Palomino, unprovoked and in
9  what both parties agree appeared to be an extremely nervous
10  state, provided Officer Kropholler with identification, got out
11  of the vehicle, and placed his hands in a fashion to indicate he
12  consented to the search of his person.  Defendant Sanchez-
13  Palomino never indicated, with words or gestures, that he
14  objected to Officer Kropholler's conduct or otherwise intended
15  not to cooperate, nor did he in any way attempt to alert the
16  officers to his limited English proficiency.  He never stated in
17  Spanish that he did not understand English, nor did he enlist the
18  assistance of his traveling companion Defendant Velasco, who
19  appeared to have a better command of English than Defendant
20  Sanchez-Palomino.  Examining the totality of the circumstances,
21  the Court concludes as a matter of law that Defendant Sanchez-
22  Palomino understood the nature of the situation enough to
23  generally follow Officer Kropholler's commands and freely consent
24  to a search of his person.[8]

25  ///

26

27       [8] Defense argues, and the Court agrees, that since the
    Government failed to previously argue inevitable discovery of the
28  bolt and socket, the argument is waived.  However, the point is
    moot, given the Court's decision that the search was valid.

28

1              3.    **Prolonging the Traffic Stop**

2

3       Defense contends the stop was unreasonably prolonged because

4 the purported purpose of the stop was to issue a warning

5 citation, not to look for drugs.  The "touchstone of the Fourth

6 Amendment is reasonableness."  <u>United States v. Turvin</u>, 517 F.3d

7 1097, 1101 (9th Cir. 2008) (quoting <u>Florida v. Jimeno</u>, 500 U.S.

8 248, 250 (1991)).  To examine the reasonableness of the length of

9 a traffic stop, a court examines the "totality of the

10 circumstances surrounding the stop."  <u>Turvin</u>, 517 F.3d at 1101

11 (internal citations omitted).  Particularly when officers have

12 "probable cause to know of a traffic violation," any questions

13 asked or procedures conducted by police, as long as they are

14 within reason and "create little or no inconvenience," are

15 constitutionally reasonable under the law.  <u>Id.</u> at 1103 (internal

16 citations omitted).

17       Specifically, the use of a "well-trained narcotics-detection

18 dog" to search for hidden contraband "during a lawful traffic

19 stop" does "not rise to the level of a constitutionally

20 cognizable infringement."  <u>Illinois v. Caballes</u>, 543 U.S. 405,

21 409 (2005).  Such a sniff "reveals no information other than the

22 location of a substance that no individual has any right to

23 possess."  <u>Id.</u> at 410.  Any shift from a lawful traffic stop to a

24 drug investigation is legitimate police conduct under the Fourth

25 Amendment.  <u>Id.</u> at 408; <u>Muehler v. Mena</u>, 544 U.S. 93, 101 (2005).

26 ///

27 ///

28 ///

In the instant case, the stop was not unreasonably prolonged. After pulling the Maxima over, Officers Kropholler and McQuillan asked Defendants routine questions and verified their identities. After suspicions were raised that Defendants' stories were not aligned, and given the disheveled appearance of the vehicle, Officer Kropholler determined that Maximus could assist the officers in determining whether drugs were present in the vehicle. He retrieved Maximus from the police vehicle, and walked him around Defendants' Maxima. Using Maximus as a tool did not prolong the stop in any way, nor did it create any unreasonable circumstance for Defendants. After Maximus alerted to the rear bumper and inside the rear of the vehicle, Officers McQuillan and Kropholler searched the trunk near the rear bumper and located the cocaine in a secret compartment. This entire exercise lasted approximately five and a half minutes.

Again, examining the totality of the circumstances, nothing indicates to the Court that the stop was unreasonably prolonged or unconstitutional. While the stop was originally made for purported violations of California's vehicle code, once the officers approached the Maxima and asked Defendants a few routine questions, their extensive police training and experience indicated there may be drugs or other contraband present. Their reasonable suspicion turned the stop from a routine traffic stop into search for drugs. Case law is clear that Officers Kropholler and McQuillan did not need reasonable suspicion to engage in investigations "unrelated to the purpose of [the] initially lawful stop." Turvin, 517 F.3d at 1103. Therefore, the Court concludes as a matter of law that the stop was not unnecessarily prolonged.

1    **B.    Fourteenth Amendment**

2

3        The equal protection "component of the Due Process Clause of

4    the Fifth Amendment" ensures that selective enforcement of the

5    laws is not based on "an unjustifiable standard such as race,

6    religion, or other arbitrary classification." United States v.

7    Armstrong, 517 U.S. 456, 464 (1996) (internal citations omitted).

8    A defendant may demonstrate that "the administration of a

9    criminal law is directed so exclusively" at a particular class

10   that the government's administration of the law "amounts to a

11   practical denial of equal protection of the law." Id. at 464-65

12   (quoting Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886)).  The

13   burden is upon the defendant to dispel the presumption that the

14   government's actions are constitutionally permissible.

15   Armstrong, 517 U.S. at 465.

16       Traditional equal protection analysis applies, in that a

17   defendant must demonstrate the policy has a discriminatory effect

18   and was motivated by a discriminatory purpose.  Id.; Rosenbaum v.

19   City and County of San Francisco, 484 F.3d 1142, 1152-53 (9th

20   Cir. 2007).  To prove a discriminatory effect, the claimant must

21   show that similarly situated individuals evaded similar

22   treatment.  Id. (citing Armstrong, 517 U.S. at 465.).

23   As a threshold matter, a similarly situated class must be

24   established to compare a defendant's unconstitutional treatment.

25   Rosenbaum, 484 F.3d at 1153.  Then, the court examines what

26   evidences constitutes "some evidence tending to show the

27   existence" of a discriminatory effect.  Armstrong, 517 U.S. at

28   469.

1   To show discriminatory purpose, a defendant must show that

2   an officer "selected or reaffirmed a particular course of action

3   at least in part" because of the adverse effect on an

4   "identifiable group." Rosenbaum, 484 F.3d at 1153 (quoting

5   United States v. Wayte, 470 U.S. 598, 610 (1985)).  In addition,

6   a defendant must show that law enforcement's misconduct is part

7   of a "policy, plan, or pervasive pattern." Rosenbaum, 484 F.3d

8   at 1153.  Some conscious selective enforcement is "not in itself

9   a federal constitutional violation" as long as it is not

10  "deliberately based upon an unjustifiable standard." United

11  States v. Kidder, 869 F.2d 1328, 1335 (9th Cir. 1989).[9]

12  Defendants argue that NSI Cal-MMET DHE uses pretextual stops

13  based on traffic violations to investigate vehicles for evidence

14  of drug smuggling.  According to Defendants, the officers are

15  targeting Hispanic males, stopping them almost twice as often as

16  white drivers, in violation of the Fourteenth Amendment.  The

17  Government, on the other hand, insists that the stop of

18  Defendants' vehicle had nothing to do with the fact that the

19  driver and passenger were Mexican, and there is neither a

20  discriminatory purpose nor a discriminatory effect to NSI Cal-

21  MMET DHE's interdiction strategies.

22  ///

23

24      [9] Defendants argue that precedent established in United
25  States v. Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000),
    prevents "Hispanic appearance" from being considered when
26  officers are investigating smuggling as it pertains to the
    Fourteenth Amendment.  This is an incorrect statement of the
27  holding.  The Ninth Circuit stated that Hispanic appearance may
    not be considered "as a relevant factor where particularized or
28  individualized suspicion" is required for Fourth Amendment
    purposes.  Id. at 1135.

1    Despite their efforts, Defendants have failed to establish

2  there is a discriminatory effect to the officers' traffic stops

3  and any subsequent vehicle searches.   There has been no evidence

4  submitted by Defendants that indicates similarly situated

5  individuals, namely Caucasians, are <u>not</u> being stopped for

6  violating the traffic code on I-5 in Shasta County.   Defendants

7  have attempted to use both Shasta County population data, and I-5

8  collision data to establish an appropriate "baseline," or

9  statistical comparator by which the Hispanic male traffic in the

10  area could be compared.

11    Both statistical evaluators fail.   The racial demographics

12  of Shasta County play no role in assessing whether the number of

13  Hispanic male stops on the highway is high, since the local

14  demographics are hardly indicative of the interstate traffic

15  along such a popular highway artery as I-5, let alone the number

16  of people of all colors speeding on the road.   Similarly, any

17  statistical evidence culled from traffic collision data, or even

18  the warning citation data itself[10], fails to demonstrate that

19  while Hispanic males are being stopped and searched on this

20  stretch of I-5, Caucasian males similarly situated are either in

21  violation of the traffic code, stopped, and then not searched, or

22  are altogether avoiding law enforcement interaction.

23  ///

24  ///

25

26    [10] At the February 14, 2011 Evidentiary Hearing, Defendants'
asserted that they believe any statistics borne from data
compiled from the warning citations are faulty because the

27  warning citations are not uniformly issued and the actual number
of stops is inherently under-reported.   <u>See also</u> Def. Opening

28  Brief, ECF No. 118, at 20.   The Court agrees.   <u>See</u> <u>supra</u>.

Though many Hispanic male witnesses testified to being inappropriately and excessively searched, no evidence was provided that Caucasian males have not been subject to the same treatment.

Defendants also cannot demonstrate as a matter of law that Officers Kropholler and McQuillan are specifically stopping Hispanic drivers because they are in fact Hispanic.  In his brief, Defendant Sanchez-Palomino states that the officers are making pre-textual traffic stops because "Hispanic male drivers are more likely to be high-level smugglers than other drivers on the road."  No such evidence was ever presented during the hearing.  Officers Kropholler and McQuillan do not use race or gender as factors in determining who they stop along I-5, and their enforcement of the vehicle code is not predicated at the onset by the race or gender of the driver.  The officers use their police training and knowledge to objectively evaluate whether criminal indicators are present once the vehicles are stopped.  And here again, no evidence was presented that the officers use race as a factor in assessing the potential criminal activity afoot in a stopped vehicle.

The Court agrees with Defendants that a large number of Hispanic males in this area of I-5 are stopped and searched. However, suspicion and conjecture cannot surmount the requisite constitutional threshold of finding a bona fide violation of one's Equal Protection rights.  For these reasons, the Court concludes that the officers' conduct in the instant case does not violate Defendants' rights under the Fourteenth Amendment.
///

1

**CONCLUSION**

2

3          For the foregoing reasons, Defendants' Motions to Dismiss

4    the Indictment or Suppress Evidence (ECF Nos. 59 and 60) are

5    DENIED.   The trial date is confirmed for March 21, 2011 at

6    9:00 a.m.

7          IT IS SO ORDERED.

8
     Dated: February 18, 2011

9

10

11                              _____
                                MORRISON C. ENGLAND, JR.
12                              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28